**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**WESTERN DIVISION**

| | |
|---|---|
| **ARISSA PODRAZA, SUSAN COLBY, and JESSICA KELLER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**NOURISH, INC.**,<br><br>Defendant. | Case No.: 3:25-cv-50356<br><br>Honorable Iain D. Johnston |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ....................1

II. FACTUAL BACKGROUND ....................2

- A. Google's Tracking Tools ....................2
- B. Defendant's Use of the Tracking Tools ....................3

III. STANDARD OF LAW ....................3

IV. ARGUMENT ....................4

- A. DEFENDANT PURPOSEFULLY CONDUCTED BUSINESS IN ILLINOIS AND CAUSED INJURIES IN ILLINOIS GIVING THIS COURT PERSONAL JURISDICTION. ....................4
  - i. Defendant purposefully directed its business activities to the state of Illinois. ....................4
  - ii. Plaintiffs' claims arise out of Defendant's contacts with Illinois. ....................8
  - iii. The Court's exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice. ....................9
- B. PLAINTIFFS DID NOT CONSENT TO NOURISH'S DISCLOSURES OF THEIR SENSITIVE HEALTH INFORMATION. ....................10
  - i. Nourish's browsewrap Privacy Policy is not enforceable. ....................10
  - ii. The general disclosures in Nourish's Privacy Policy are contradicted by the specific terms of its HIPAA Privacy Notice. ....................11
- C. PLAINTIFFS' WIRETAP CLAIMS ARE WELL PLED ....................12
  - i. Plaintiffs' allegations satisfy the ECPA's crime-tort exception. ....................12
  - ii. Plaintiffs' CIPA and ECPA claims are well-pled. ....................19
- D. PLAINTIFFS' INVASION OF PRIVACY CLAIM IS WELL-PLED. ....................23
- E. PLAINTIFFS STATE A VALID CLAIM FOR BREACH OF IMPLIED CONTRACT ....................25
- F. PLAINTIFFS STATE A VALID CLAIM FOR BREACH OF FIDUCIARY DUTY ....................27

G. PLAINTIFFS STATE A VALID CLAIM FOR NEGLIGENCE ....... 28

i. Plaintiffs allege the existence of a duty that was breached by Nourish. ....... 28

ii. Plaintiffs' negligence claim is not foreclosed upon by the economic loss doctrine. ....... 29

H. PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT ....... 29

V. CONCLUSION ....... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
751 F.3d (7th Cir. 2014) .......... 8

*B.K. v. Eisenhower Med. Ctr.*,
2024 U.S. Dist. LEXIS 67497 (C.D. Cal. 2024) .......... 17

*Brahm v. Hosp. Sisters Health Sys.*,
2024 U.S. Dist. LEXIS 114827 (W.D. Wis.2024) .......... 23

*Bristol-Myers Squibb Co. v. Superior Court*,
137 S. Ct. (2017) .......... 8

*Burger King Corp. v. Rudzewicz*,
471 U.S. (1985) .......... 4, 9

*Citadel Grp., Ltd. v. Wash. Reg'l Med. Ctr.*,
536 F.3d (7th Cir. 2008) .......... 4

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*,
59 Ill. 2d (Ill. 1994) .......... 29

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d (S.D.N.Y. 2024) .......... 17

*Curry v. Revolution Labs., LLC*,
949 F.3d (7th Cir. 2020) .......... 4

*Danforth v. Placentia-Linda Hosp.*,
2023 Cal. Super. LEXIS 67193 (Cal. Super. Ct. 2023) .......... 22

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 U.S. Dist. LEXIS 66733 (N.D. Cal. 2024) .......... 19

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
514 F.3d (10th Cir. 2008) .......... 4

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
141 S. Ct. (2021) .......... 8

*Gay v. Garnet Health*,
2024 U.S. Dist. LEXIS 168515 (S.D.N.Y. 2024) .......... 17

*Hartley v. Univ. of Chi. Med. Ctr.*,
2024 U.S. Dist. LEXIS 78517 (N.D. Ill. 2024) .......... 17

*Heerde v. Learfield Commc'ns, LLC*,
2024 U.S. Dist. LEXIS 137781 (C.D. Cal. 2024) .......... 20

*Illinois v. Hemi Group LLC*,
622 F.3d (7th Cir. 2010) .......... 5

*In re Facebook, Inc.*,
402 F. Supp. 3d (N.D. Cal. 2019) .......... 24

*Int'l Shoe Co. v. Wash.*,
326 U.S. (1945) .......... 9

*Johnson v. K mart Corp.*,
311 Ill. App. 3d (2000) .......... 23

*Kane v. Univ. of Rochester,*
2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. 2024) .......... 17

*M.G. v. Therapymatch, Inc.*,
2024 U.S. Dist. LEXIS 166534 (N.D. Cal. 2024) .......... 22

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d (D. Minn. 2024) .......... 17

*Mutnick v. Clearview AI, Inc.*,
2020 U.S. Dist. LEXIS 144583 (N.D. Ill. 2020) .......... 10

*NBA Props. v. HANWJH*,
46 F.4th 614 (7th Cir. 2022) .......... 4, 5

*Purdue Research Found. v. Sanofi-Synthelabo S.A.*,
338 F.3d 773 (7th Cir. 2003) .......... 9

*Reed v. MRS BPO, L.L.C.*,
No. 1:21-CV-04066, 2022 U.S. Dist. LEXIS 156394 (N.D. Ill. 2022) .......... 23

*R.S. v. Prime Healthcare Servs*,
2025 U.S. Dist. LEXIS 6338 (C.D. Cal. 2025) .......... 19

*Stein v. Edward-Elmhurst Health*,
2025 U.S. Dist. LEXIS 31273 (N.D. Ill. 2025) .......... 19

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) .......... 4

*Thakkar v. Proctoru Inc.*,
571 F. Supp. 3d (C.D. Ill. 2021) .......... 10

**Statutes**

18 U.S.C. § 2511 .......... 12, 20

815 Ill. Comp. Stat. Ann. 530/45 .......... 28

Cal. Penal Code ]§ 631 .......... 22

## I. PRELIMINARY STATEMENT

Healthcare information is among the most sensitive and private information about a person. It is also among the most valuable. Defendant Nourish, Inc. ("Nourish" or "Defendant") knew this when, without prior authorization from Plaintiffs, it collected and shared Plaintiffs' sensitive personal and healthcare information with third-parties, including Google, one of the largest advertising companies in the world.

Nourish is a telehealth provider that operates a website at www.usenourish.com (the "Website"), where patients can search for and schedule appointments with Nourish's dietitians. Plaintiffs are individuals who booked telehealth appointments through the Website. When they made their appointments, Plaintiffs believed that their medical information, including the information regarding their appointments, would be held to the standard of confidentiality expected for such sensitive information. Unfortunately, it was not. Unbeknownst to Plaintiffs, Nourish installed advertising surveillance software, including third-party tracking pixels, produced by Google (the "Tracking Tools") on the Website and, in exchange for advanced marketing and advertising services, allowed the internet behemoth to collect sensitive personally identifiable and protected health information from users of the Website for the purpose of engaging in targeted advertising. These Tracking Tools allowed Nourish to collect and transmit a substantial amount of additional sensitive information about users like Plaintiffs to third parties. This information includes (a) the fact that the patient is scheduling an appointment with a dietitian, (b) the specific medical provider that will treat the patient, (c) the state in which the dietitian is licensed, and (d) the date of the patient's appointment (collectively, the "Sensitive Health Information"). ECF No. 1 ("Complaint" or "Compl.") ¶ 48.[1]

[1] Due to an inadvertent formatting error, the paragraph numbering in the Complaint re-starts after Paragraph 21, i.e., there are two paragraphs numbered with numbers 1-21. For clarity, this brief denotes citations to ¶¶ 1-21 with an asterisk ("*") when referring to the first set of paragraphs numbered 1-21, located at pages 1-6 of the Complaint.

Despite deliberately installing and customizing the Tracking Tools, Nourish disclaims any liability for its disclosure of Plaintiffs' Sensitive Information in its Motion to Dismiss. *See* ECF No. 24 (the "Motion" or "Mot."). First, Nourish argues that the Court lacks personal jurisdiction over it, ignoring the fact that it has purposefully availed itself of the privilege of conducting business in Illinois by employing dietitians licensed in Illinois and marketing their services to Illinois residents. Next, Nourish argues that all of Plaintiffs' claims should be dismissed because they have failed to allege that actual health information was disclosed. Critically, Nourish does *not* deny making the complained-of disclosures, but rather argues that the type of information disclosed is insufficient to support Plaintiffs' causes of action. But, as explained herein, Plaintiffs' Sensitive Health Information is obviously HIPAA-protected health information which Nourish is obligated to keep confidential under federal law. For these reasons and others elaborated on below, Nourish's Motion to Dismiss should be denied.

## II. FACTUAL BACKGROUND

### A. Google's Tracking Tools

Google offers website operators access to its proprietary suites of marketing, advertising and customer analytics software. Compl. ¶ 8*. Armed with these programs, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited. *Id.* But, in exchange for access to this software, website operators must install Google's Tracking Tools on their website—third party surveillance software that captures sensitive, personally identifiable information provided to the website operator by its users. *Id.* ¶ 9*. Google then aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user. *Id.* ¶ 22. With these advertising profiles, Google can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g.,

recent marriages, graduation, or income, type of employment, use of specific apps or websites, and more). *Id.* Where an internet user has a Google account, this information can be correlated to their identity, through tracking cookies installed on the user's web browser. *Id.* ¶¶ 38-42.

### B. Defendant's Use of the Tracking Tools

Nourish installed Google's Tracking Tools on the Website. Compl. ¶ 30. Then, Nourish specifically chose to take the generic version of the Tracking Tools and configure them to convey all of the information communicated by users of the Website while making an appointment. *Id.* ¶ 47. All of this Sensitive Information is shared with Google, allowing advertisers to use it for the purpose of targeted advertising. *Id.* ¶ 6*. Defendant made use of these Tracking Tools without disclosing to Website users that their Sensitive Health Information was being collected, tracked, and disclosed to third parties, including Google. *Id.* ¶ 52.

## III. STANDARD OF LAW

A Rule 12(b)(6) motion tests whether the plaintiff has provided "enough factual information to state a claim to relief that is plausible on its face" and has raised "a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Courts must deny a motion to dismiss if the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 555-56 (2007)).

## IV. ARGUMENT

### A. DEFENDANT PURPOSEFULLY CONDUCTED BUSINESS IN ILLINOIS AND CAUSED INJURIES IN ILLINOIS GIVING THIS COURT PERSONAL JURISDICTION.

Specific personal jurisdiction exists where: (1) the defendant's contacts with the forum state show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state; (2) the plaintiff's alleged injury arose out of the defendant's forum-related activities; and (3) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *NBA Props. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022). Ultimately, "the 'defendant's conduct and connection with the forum State' must be such that it should 'reasonably anticipate being haled into court there.'" *Citadel Grp., Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

#### i. Defendant purposefully directed its business activities to the state of Illinois.

The Seventh Circuit has made clear that "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir. 2020). On the contrary, "the 'purposeful-direction inquiry 'can appear in different guises.'" *Id.* (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)). "The essential point of the inquiry is to 'ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state.'" *Id.* (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008)). "The principal approach employed to ensure that a defendant's contacts with a state are not random, fortuitous, or attenuated is to inquire whether the record demonstrates that the defendant has 'purposefully directed' his activities at a forum even in the 'absence of physical contacts' with a forum." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184 (1985) (internal quotation marks omitted)). Indeed, "it is an

inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184 (1985).

Here, Plaintiffs allege that Nourish directed its activities at residents in Illinois by (1) offering to connect them with dietitians licensed in the State and (2) directly employing dietitians in Illinois as part-time and full-time employees. The Seventh Circuit has routinely found specific personal jurisdiction where an online entity offered its services or product(s) to Illinois residents. For example, in *Illinois v. Hemi Group LLC*, the Seventh Circuit held that defendant, Hemi, had sufficient minimum contacts with Illinois such that exercising personal jurisdiction over Hemi in Illinois was appropriate because "Hemi created several commercial, interactive websites through which customers could purchase cigarettes from Hemi[;]. . . Hemi held itself out as open to do business with every state . . . [and a]fter the customers made their purchases online, Hemi shipped the cigarettes to their various destinations." 622 F.3d 754, 758 (7th Cir. 2010). Likewise, in *NBA Properties, Inc. v. HANWJH*, the Seventh Circuit found that defendant had sufficient minimum contacts with Illinois where defendant "established an online store" and "[w]hen an order was placed, it filled the order, intentionally shipping an infringing product to the customer's designated Illinois address." 46 F.4th 624, 624, 627 (7th Cir. 2022).

While Defendant in this case may not ship any products, it *does* offer services both nationally and specifically within Illinois and, importantly, targets Illinois residents with those services. The entire point of Defendant's business model is to connect users with dietitians *licensed in their state*. Here, Plaintiffs Podraza and Keller searched for dietitians available to see patients in Illinois. Indeed,

Defendant's search tool specifically allows users to filter by their state of residence when searching for dietitians.[2]

In Defendant's Motion, it argues that it "merely" operates an interactive website accessible in Illinois and cites three inapposite cases to shore up its position. *See* Mot. at 7. The decision in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014) turned on the fact that the products sold and shipped into Indiana were unrelated to the trademark infringement claim that was the subject of the litigation. *Id.* at 803. In *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011), the Seventh Circuit held that the defendant's operation of a website on which only *twenty* Illinois residents simply registered for accounts could not support a finding of specific jurisdiction over the defendant. And *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hou. Metroplex, P.A.*, 623 F.3d 440, 446 (7th Cir. 2010) concerned a website that did not contain much other than "a Houston-area phone number, an e-mail address, and an invitation to doctors in the 'greater Houston area' to contract for [defendant's] services."

The facts of these three cases are not even remotely comparable to those at issue here. Indeed, as the Court in *Mobile Anesthesiologists* noted, "[a] defendant's deliberate and continuous exploitation of the market in a forum state, accomplished through its website as well as through other contacts with the state, *can* be sufficient to establish specific personal jurisdiction." *Id.* (emphasis added). Rather, this case is similar to *uBID, Inc. v. GoDaddy Grp., Inc*, in which the defendant "thoroughly, deliberately, and successfully exploited the Illinois market…" such that "[i]ts attempt to portray itself either as a local Arizona outfit or as a mindless collection of servers [wa]s unconvincing." 623 F.3d 421, 427 (7th Cir.

---

[2] *See* "State" filter when using Defendant's "Find a dietitian" tool, NOURISH, www.usenourish.com (click "Find a dietitian" link, then click "State" filter to filter options by state) (last accessed Feb. 2, 2026). Defendant makes multiple references to the contents of the Website in its Motion, arguing that it may properly do so because the Website is referenced by the Complaint. Mot. at 3. Accordingly, the references to the Website in the instant brief are proper as well.

2010). Further, the *GoDaddy* Court found specific personal jurisdiction over the defendant even though there was "no evidence that [defendant] specifically target[ed] Illinois customers in its advertising." 623 F.3d 421, 428 (7th Cir. 2010). In doing so, the Court likened the facts of *GoDaddy* to *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, (1984), in which "the [defendant] had purposefully directed its business activities toward New Hampshire just as it had toward all other states." *Id.* at 428 (citing *Keeton*, 465 U.S. at 774).

The Court noted that, "[c]onsistent with the reasoning of *Keeton*, it is easy to infer that [defendant]'s national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state." *Id.* Even though the defendant in *GoDaddy* did not sell or ship physical products to Illinois, "[defendant] [was] aware that it earn[ed] many millions of dollars annually from Illinois customers, and it cannot be unhappy to have had such success in the state." *Id.* Indeed, just as in *GoDaddy*, Defendant has "purposefully availed itself of the Illinois market for its services through its deliberate and continuous exploitation of that market." *Id.* at 429.

So, despite Defendant's protestations, the fact that they offer services nationally does not somehow absolve them from this Court's jurisdiction. In fact, Defendant does significantly more than the defendant in *GoDaddy* to target Illinois consumers. Defendant hires dietitians to become part of its nationwide network. In doing so, it asks in which state the dietitian wants to be considered for a part-time or full-time role.[3] Defendant also markets itself to dietitians by promising to reduce their administrative load, taking care of things like credentialing and multi-state licensing.[4] To take care of these administrative tasks, Defendant's staff must be aware of relevant state laws regarding dietitians,

---

[3] *See Registered Dietitian Application*, NOURISH, www.usenourish.com/dietitian-application (last accessed Feb. 2, 2026).

[4] *Become a Dietitian*, NOURISH, www.usenourish.com/become-a-dietitian (last accessed Feb. 2, 2026).

so Defendant cannot reasonably say that it was *not* targeting patients within Illinois or seeking to exploit the state's market.

**ii. Plaintiffs' claims arise out of Defendant's contacts with Illinois.**

"The proper exercise of specific jurisdiction also requires that the defendant's minimum contacts with the forum state be 'suit-related.'" *Curry*, 949 F.3d at 400 (quoting *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014)). The "most common formulation" of this requirement "demands that the suit 'arise out of or relate to the defendant's contacts with the forum.'" *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1021 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1786 (2017)).

In *Illinois v. Hemi*, the Seventh Circuit held that plaintiff's claims arose out of defendant's contacts with Illinois where defendant "sold and shipped [the product] to Illinois residents, and [defendant's] actions surrounding those sales triggered [plaintiff's] claims against it." 622 F.3d at 759. The same is true here. Plaintiffs Podraza and Keller allege that they were injured by Defendant's surreptitious disclosure of their Sensitive Health Information which occurred when they visited the website and made appointments to see dietitians licensed in Illinois. Compl. ¶¶ 17-21*, 8-12, 46-49. Moreover, Plaintiffs Podraza and Keller had their privacy violated when the Pixels and other Tracking Tools employed by Defendant intercepted and disclosed the Sensitive Health Information directly from Plaintiffs' and Class Members' browsers which were located in Illinois. *Id.* ¶¶ 38-41. The relatedness prong of the personal jurisdiction analysis is therefore satisfied. *See Hemi*, 622 F.3d at 759.

Defendant largely relies on out-of-circuit cases to support its argument to the contrary. But this simply cannot change the reality that Plaintiffs Podraza and Keller would *not* have visited Defendant's Website if Defendant did not specifically *employ* and *offer appointments with* dietitians licensed in Illinois. Moreover, as stated above, Plaintiffs Podraza's and Keller's injuries *specifically* stem from their interactions with Defendant's Website in scheduling their appointments.

### iii. The Court's exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

In determining whether the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945), the Seventh Circuit has instructed that courts may consider:

> [T]he burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies.

*Purdue Research Found. v. Sanofi-Synthelabo S.A.*, 338 F.3d 773, 781 (7th Cir. 2003). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. 462 at 476.

There is no unfairness in subjecting Defendant to jurisdiction in Illinois. Although Defendant is not physically present in Illinois, "it has structured its marketing so that it can easily serve the state's consumers—and it has done so by selling the [relevant] product in substantial quantity." *Curry*, 949 F.3d at 402. Indeed, "[t]here is no unfairness in requiring a defendant to defend a lawsuit in the courts of the state where, through the very activity giving rise to the suit, it continues to gain so much." *Id.* (cleaned up). Just as in *Curry*, Defendant "has held itself as conducting business nationwide through . . . its interactive website." *Id.* "Thus, the burden of requiring [Defendant] to defend a lawsuit in Illinois is minimal." *Id.* Defendant should not be allowed to "have its cake and eat it too" by enjoying "the benefit of a nationwide business model with none of the exposure." *Hemi*, 622 F.3d at 760.

"[Courts] must also be mindful of Illinois's significant interest in providing a forum for its residents to seek relief when they suffer harm in Illinois from a wrong that occurred at least in part in Illinois." *GoDaddy*, 623 F.3d at 432; *see also Curry*, 949 F.3d at 402 ("Illinois has a strong interest in providing a forum for its residents…to seek redress for harms suffered within the state by an out-of-

state actor."); *Thakkar v. Proctoru Inc.*, 571 F. Supp. 3d 927 (C.D. Ill. 2021) ("The court acknowledges that Illinois has 'a strong interest in protecting the privacy rights of Illinois residents' including Plaintiffs.") (quoting *Mutnick v. Clearview AI, Inc.*, 2020 U.S. Dist. LEXIS 144583, at *4 (N.D. Ill. Aug. 12, 2020)).

Though Defendant is not physically present in the State, "it has structured its marketing so that it can easily serve the state's consumers." *Curry*, 949 F.3d at 402. Defendant has likewise "held itself as conducting business nationwide through…its interactive website…." *Id.* "There is no unfairness in requiring [a defendant] to defend [a] lawsuit in the courts of the state where, through the very activity giving rise to the suit, it continues to gain so much." *GoDaddy*, 623 F.3d at 43.

For these reasons, the Court should determine that its exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

## B. PLAINTIFFS DID NOT CONSENT TO NOURISH'S DISCLOSURES OF THEIR SENSITIVE HEALTH INFORMATION.

### i. Nourish's browsewrap Privacy Policy is not enforceable.

Internet agreements are generally divided into two categories: clickwrap agreements and browsewrap agreements. *Kite v. Dentologie, P.C.*, No. 25 CV 06951, 2025 U.S. Dist. LEXIS 255631, at *3 (N.D. Ill. Dec. 10, 2025). "Clickwrap agreements have 'I accept' buttons or boxes that a customer clicks. In contrast, browsewrap agreements 'provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions . . . [and] typically are not enforced.'" *Id.* (quoting *Domer v. Menard, Inc.*, 116 F.4th 686, 694-95 (7th Cir. 2024)). Here, Nourish states that there is a "conspicuous link" to the Privacy Policy on every page of the Website but does not claim that Plaintiffs took any affirmative action to signal assent to its terms, such as clicking an "I accept" button. Mot. at 2. Therefore, the Privacy Policy is a browsewrap agreement.

As Plaintiffs did not have actual knowledge of the Privacy Policy's terms, Defendant must establish constructive knowledge for its terms to be enforceable. *Alan Ross Mach. Corp. v. Machinio*

*Corp.*, No. 17-cv-3569, 2018 U.S. Dist. LEXIS 113012, at *12 (N.D. Ill. July 9, 2018).[5] But, the only notice Nourish claims to have provided is a hyperlink at the bottom of every page of the Website. This alone renders the Privacy Policy unenforceable: a hyperlink "at the bottom of every page is insufficient to provide adequate constructive notice to create a contract based on a browsewrap agreement." *Id.* at *13 (collecting cases). Further, while Nourish claims that the Privacy Policy hyperlinks are "conspicuous," it makes no effort to describe the actual placement of the hyperlinks, nor does it include a screenshot depicting the hyperlinks as an exhibit. Mot. at 2. The reason for these omissions becomes obvious upon examination of the Website: in reality, the link to the Privacy Policy is not at all conspicuous. As shown by Exhibit One to the Declaration of Sonjay Singh filed contemporaneously with this brief, the Privacy Policy hyperlink is on the very last line of the Website footer, hidden beneath the Nourish logo and two lengthy site navigation menus. Even if a user were to ever scroll down this far, the hyperlink is still easily overlooked due to both its placement next to Nourish's copyright notice, and its smaller font size than every single line of text that precedes it. Nourish simply cannot establish adequate notice under these circumstances, and the Privacy Policy is thus unenforceable.

#### ii. The general disclosures in Nourish's Privacy Policy are contradicted by the specific terms of its HIPAA Privacy Notice.

Even if Nourish could establish adequate notice, the Privacy Policy would not establish Plaintiffs' consent to its disclosures of their Sensitive Health Information. As discussed herein, all of the Sensitive Health Information that Plaintiffs allege was disclosed through the Tracking Tools

---

[5] Nourish notes that despite "never mentioning the Privacy Policy," Plaintiffs' Complaint still makes representations about promises made in its terms. Mot. at 2. Defendant's confusion is understandable. Plaintiffs and their counsel were not aware of the existence of the Privacy Policy until they reviewed Nourish's Motion. The references to a "Privacy Policy" in the Complaint are meant to refer to Nourish's HIPAA Notice of Privacy Practices, which ***is*** discussed and cited in the Complaint. *See* Compl. ¶¶ 51-54.

constitutes protected health information under HIPAA. While the Privacy Policy does discuss Google Analytics generally, it explicitly states that health information "is used only to support your personalized care and is never shared with third parties without your consent."[6] Moreover, separate from the Privacy Policy, Nourish also has a HIPAA Privacy Notice which states that, *inter alia*, Nourish "is required by law [to] make sure that protected health information ("PHI") that identifies you is kept private"; "does not sell PHI"; "does not use PHI for marketing purposes." Nourish cannot reasonably claim that the general representations in its Privacy Policy somehow supersede these specific representations regarding the exact class of information at-issue in this matter.

### C. <u>PLAINTIFFS' WIRETAP CLAIMS ARE WELL PLED</u>

#### i. Plaintiffs' allegations satisfy the ECPA's crime-tort exception.[7]

A claim exists under the ECPA where a defendant intentionally uses or discloses the contents of an intercepted electronic communication. 18 U.S.C. § 2511(1)(c)-(d). Where, like here, the defendant is a party to the communication, liability may still be established through the 'crime-tort exception' if the defendant's interception is "for the purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Plaintiffs' allegations satisfy the crime-tort exception because they plausibly allege that Nourish installed and configured the Tracking Tools to disclose their Sensitive Health Information without their knowledge or consent. In other words, Plaintiffs allege that Defendant's purpose in installing the Tracking Tools was to commit a "criminal or tortious act": disclosure of protected health information without authorization in violation of HIPAA.

---

[6] *Privacy Policy*, NOURISH, www.usenourish.com/privacy (last accessed Feb. 5, 2026).
[7] CIPA requires all-party consent, so this section is not relevant to Plaintiffs' CIPA claim. *See* Cal. Penal Code § 631.

#### 1. *Plaintiffs' Sensitive Health Information is IIHI under HIPAA.*

Individually identifiable health information ("IIHI") includes any information that: (1) "is created and received by a health care provider[,]" (2) "relates to the present, past, or future physical or mental health or condition of an individual, [or] the provision of healthcare to an individual," which (3) "identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Information showing that an individual is a patient of a specific medical provider (the individual's "patient status") constitutes IIHI under HIPAA. *See Allen v. Midwest Express Care, Inc.*, No. 24-cv-05348, 2025 U.S. Dist. LEXIS 151237, at *6 (N.D. Ill. Aug. 6, 2025) (finding that patient status constitutes IIHI); *Aspen Dental*, 2024 U.S. Dist. LEXIS 161090, at *3 (same).

Here, each Plaintiff alleges that they scheduled appointments with Nourish's licensed, Registered Dietitians. Compl. ¶¶ 3*, 17*, 2, 8. As a result, Plaintiffs all allege that the Tracking Tools transmitted "the fact that she was scheduling an appointment with a dietitian, the date of her appointment, the name of her treating dietitian, and the state in which her treating dietitian is licensed." *Id.* ¶¶ 18*, 3, 9. Additionally, Plaintiffs allege that this information was personally identifiable because it was disclosed alongside their Google cookie identifiers, which identify their Google accounts. *Id.* ¶ 49; *see also* ¶¶ 38-41.

Registered Dietitians are explicitly considered health care providers under HIPAA.[8] As Nourish accepts health insurance payments from a wide variety of health insurance providers in

[8] Under HIPAA, a "health care provider" is a "provider of medical or health services" as defined by 42 U.S.C. 1395x(s). *See* 45 C.F.R.160.103. These medical or health services include "an initial preventive physical examination." *See* 42 U.S.C. 1395x(s)(W). The term "initial preventive physical examination" includes "medical nutrition services." *See* 42 U.S.C. 1395x(s)(ww). The term "medical nutrition services" includes the services of a registered dietitian. *See* 42 U.S.C. 1395x(s)(vv).

connection with its services, it is a covered entity subject to HIPAA. *See* 45 C.F.R.160.103.[9] Indeed, Nourish admits as much in its HIPAA Notice of Privacy Practices, which includes a lengthy section explaining its duties under HIPAA.[10] Thus, contrary to Nourish's representations, Plaintiffs allege multiple types of IIHI: they allege that their Sensitive Health Information includes (1) the identity of the specific medical provider with whom Plaintiffs scheduled their appointments (i.e., their patient status and treating provider); (2) the fact that their appointments were with a dietitian, specifically (i.e., their medical provider's specialty); and (3) the date and time of their medical appointments (i.e., their appointment details). These facts are more than sufficient to establish that the information disclosed by Nourish qualifies as IIHI. *See Kurowski v. Rush Sys. for Health*, 2023 U.S. Dist. LEXIS 219895, at *7-8 (N.D. Ill. Dec. 11, 2023) ("*Rush* III") (holding that information regarding the name, location and specialty of plaintiff's personal physician disclosed alongside cookie identifiers is IIHI under HIPAA in analogous case involving Tracking Tools); *Midwest Express*, 2025 U.S. Dist. LEXIS 151237, at *6 (same as to "[p]laintiff's status as a medical patient…the specific locations where treatment was sought, and the particular words and phrases typed into the search bar on the website"); *Aspen Dental*, 2024 U.S. Dist. LEXIS 161090, at *3 (same as to disclosure of patient status).

Defendant attempts to analogize Plaintiffs' allegations to cases involving only disclosure that a website user visited an informational webpage with medical information. Mot. at 15-16. But "[w]ith respect to metadata like URLs, courts have differentiated between those that provide 'basic identification and address information,' and those that disclose a 'search term or similar communication made by the user.'" *Aspen*, 2024 U.S. Dist. LEXIS 161090, at *15-16 (finding that

---

[9] *See also Homepage*, NOURISH, www.usenourish.com ("Talk to a dietitian covered by your insurance….We accept hundreds of insurance plans in all 50 states…. Helping millions live healthier…. Find the perfect fit for your health journey…. 80% of patients see health improvements in 30 days").

[10] *See* Compl. ¶ 51 (quoting *Notice of Privacy Practices*, NOURISH, www.usenourish.com/nourish-consent).

information entered in fillable forms disclosed through URL header data was user-specific health communication). "If instead a URL is 'part of the substantive information conveyed to the recipient, then by definition it is content[,['" actionable under the ECPA. *Smith v. Loyola Univ. Med. Ctr.*, No. 23 CV 15828, 2024 U.S. Dist. LEXIS 119995, at *15-16 (N.D. Ill. July 9, 2024) (quoting *In re Google Inc.*, 806 F.3d at 137). Plaintiffs **do not** allege that they merely browsed informational webpages. They allege that they scheduled appointments to receive medical care on the Website, and that the personally identifiable information transmitted to Google as a result included the fact that they had scheduled an appointment with a registered dietitian, the date of their appointment, and the identity of their medical provider. Compl. ¶¶ 18*, 3, 9, 47-50. Yet, Nourish argues that "Plaintiffs do not allege sufficient facts to indicate *why* an individual visited the Nourish Website." Mot. at 16. This assertion is baffling. How much clearer could Plaintiffs' reasons for visiting the Website be than for the purpose of scheduling an appointment, with a specific provider, in a specific specialty, on a specific date?

A close look at the cases cited by Nourish reveals why Nourish's arguments are wholly inapplicable to this matter. In *Hannant v. Sarah D. Culbertson Mem'l Hosp.*, the court found that while the plaintiff had hypothetically described disclosures that would constitute IIHI, such as information relating to the acts of "calling to schedule an appointment, calling a specific provider, and logging in to Defendant's patient portal," she had failed to explain the actions that she ***personally*** took on the defendant's website that could "demonstrate[] her patient status or what activities she took with respect to the patient portal." 2025 U.S. Dist. LEXIS 161412, at *4 (C.D. Ill. Aug. 20, 2025). the contrary, Plaintiffs here plead the exact allegations the court found were missing in *Hannant:* that they took specific actions on the Website to schedule appointments, and that the details of those appointments were disclosed as a result. The out-of-circuit *AHA v. Becerra* decision is even less applicable. 738 F. Supp. 3d 780, 789 (N.D. Tex. 2024). In *Bercera*, the court found that the combination

of an individual's IP address and the fact that they visited a specific page on a hospital website (but did not take any action like scheduling an appointment or accessing a patient portal) was not IIHI as:

> There are many *generic reasons* why they may have visited such pages, entirely unrelated to the health, healthcare, or payment for healthcare of *any* particular individual (*e.g.*, they could be public-health researchers or hospital employees). In addition, even if their visits were related to some individual's healthcare needs, they could have been acting for family members, friends, or countless other third parties. And their IP addresses provide no reasonable basis to determine otherwise.

*Id.* at 801 This rationale is not applicable to these facts. Plaintiffs' Sensitive Health Information shows that they personally scheduled medical appointments with specific providers, not that they merely browsed an informational webpage. Moreover, Plaintiffs do not allege that their Sensitive Health Information is primarily identifiable through their IP addresses (which may be shared by other Internet users), but rather through their Google cookie identifiers: Google's primary, proprietary mechanism for identifying data pertaining to Plaintiffs (and everyone else).

*2. Plaintiffs' allegations that Defendant violated HIPAA satisfy the crime-tort exception.*

Courts both "in this District" and from "coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception under the ECPA" under nearly identical facts to those alleged by Plaintiffs. *Stein v. Edward-Elmhurst Health*, No. 23-cv-14515, 2025 U.S. Dist. LEXIS

31273, at *11-12 (N.D. Ill. Feb. 21, 2025) (collecting cases).[11] One court within this District illustrated this principle well with the following hypothetical involving a jaywalking supervillain:

> Imagine if the City of Chicago banned jaywalking, with one exception. Imagine if the City of Chicago allowed jaywalking if a person is by himself, unless that person jaywalks for the purpose of committing a crime or tort.
>
> Suppose that the Joker jaywalked by himself for the purpose of robbing Gotham Bank across the street. In that scenario, the 'crime or tort' is not the jaywalking. The crime or tort is the bank robbery. So the carve-out to the exception would apply. And Commissioner Gordon could give the Joker a ticket for jaywalking (in addition to arresting him for robbing the bank).
>
> But imagine if the Joker jaywalked by himself for the purpose of saying hello to the Penguin across the street. Saying hello to the Penguin is not a crime or a tort. So, the carve-out to the exception would not apply. In that situation, the Joker would not violate the jaywalking ordinance — he jaywalked, but he was by himself, and he didn't jaywalk to commit a crime or tort…
>
> A disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA. That's enough to conclude that the crime-tort exception applies. That is, the crime-tort exception to the one-party consent rule applies, because a violation of HIPPA is a crime or tort.

*Id.* at *9-11. Plaintiffs allege that Defendant installed and configured the Tracking Tools to intercept their HIPAA-protected health information for the purpose of disclosing it to unauthorized third parties, including Google. This is enough to satisfy the crime-tort exception. *See id.* at *16-17 ("[T]he complaint alleges that [defendant] disclosed Plaintiffs' health information to a third party in violation of [HIPAA]. That's enough to get around the ECPA's one-party consent rule, because the crime-tort

---

[11] *See also Aspen*, 2024 U.S. Dist. LEXIS 161090, at *3 (finding crime-tort exception satisfied through use of Tracking Tools to disclose HIPAA-protected information); *Rush* III, 2023 U.S. Dist. LEXIS 219895, at *3 (same); *Loyola Univ. Med. Ctr.*, 2024 U.S. Dist. LEXIS 119995, at *7 (same); *Mayer*, 2025 U.S. Dist. LEXIS 60486 (N.D. Ill. Mar. 31, 2025) (same); *Hartley II*, 2024 U.S. Dist. LEXIS 78517 (same); *Prime Healthcare Servs.*, 2025 U.S. Dist. LEXIS 6338, at *20 (same); *B.K. v. Eisenhower Med. Ctr.*, 2024 U.S. Dist. LEXIS 67497, at *4 (C.D. Cal. Apr. 11, 2024) (same); *Kane v. Univ. of Rochester*, No. 23-CV-6027-FPG, 2024 U.S. Dist. LEXIS 48515, at *23 (W.D.N.Y. Mar. 19, 2024) (same); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn. 2024) (same); *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 380 (S.D.N.Y. 2024) (same); *Gay v. Garnet Health*, No. 23-cv-06950 (NSR), 2024 U.S. Dist. LEXIS 168515, at *13 (S.D.N.Y. Sep. 16, 2024) (same).

exception applies."); *Mayer v. Midwest Physician Admin. Servs., LLC*, No. 23-cv-3132, 2025 U.S. Dist. LEXIS 60486, at *10 (N.D. Ill. Mar. 31, 2025) (allegations defendant made an "affirmative choice to use these tracking tools" was "sufficient to invoke the crime-tort carve-out to the ECPA's one-party consent exception").

### *3. Nourish cannot escape liability under the ECPA by claiming its motivation for using the Tracking Tools was financial gain.*

Nourish argues that the crime-tort exception does not apply because its motive for using the Tracking Tools was to make money, not to violate the law. Mot. at 14. This argument misunderstands the relevant standard. It is irrelevant whether Nourish had a business purpose for installing the Tracking Tools because a plaintiff invoking the crime-tort exception need not allege a ***criminal or tortious purpose***. A plaintiff need only plead "sufficient facts to support an inference that the offender intercepted the communication for the ***purpose of a criminal or tortious act***[.]" *Stein*, 2025 U.S. Dist. LEXIS 31273, at *9 (collecting cases) (emphasis added). The *Stein* court helpfully illustrates this principle with a few more useful hypotheticals:

> A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose. Imagine changing lanes on the highway without looking, and nailing the car in the other lane. The bad driver may have acted with the purpose of committing an act — changing lanes — that was tortious (because of the lack of ordinary care). But that's different than saying that the driver acted with a tortious purpose.
>
> The other reading would, in effect, import a *mens rea* element into the statute. Congress could have required a showing that the person acted with a criminal or tortious purpose. The text could have covered intercepting a communication 'for a criminal or tortious purpose.' Or, the statute could have applied to intercepting a communication 'for a criminal or tortious purpose to commit a criminal or tortious act.'
>
> But that's not what the text says. The 'act' must be criminal or tortious, but the 'purpose' does not need to be criminal or tortious.
>
> Even if the carve-out required a criminal or tortious purpose, it would be odd to exclude an otherwise criminal or tortious act solely because it was also motivated by financial gain. The existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime — it was to make money.

*Id.* at *14-16. Courts faced with Defendant's exact argument have agreed that a financial motivation does not preclude a finding that the crime-tort exception applies. *See, e.g., Aspen*, 2024 U.S. Dist. LEXIS 161090, at *3 (the defendant's "[profit-related] purpose cannot be detached from the reality that [defendant] achieved this improved marketing and revenue boost by disclosing [p]laintiffs IIHI"); *Walgreen*, 733 F. Supp. 3d 876, 901 ("even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims").

Indeed, it is hard to imagine any scenario wherein a company commits an unlawful act simply for the sake of breaking the law. In the vast majority of cases, corporations that commit tortious acts have a financial motive: to obtain wealth through fraud, to cut costs by negligently ignoring business regulations or industry standards, to avoid the expenditure associated with a costly contractual provision. Nourish's position would necessarily imply, for example, that "the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money." *R.S. v. Prime Healthcare Servs.*, 2025 U.S. Dist. LEXIS 6338, at *10 (C.D. Cal. Jan. 13, 2025). With blackmail, "the interceptor's primary purpose would be to make money. And blackmail would merely be a means by which to make money. Of course, this is often the end goal for blackmail." *Id.* at *20. Thus, under Defendant's reading, "blackmail would rarely, if ever, violate the ECPA…. This cannot be the case." *Id.* Moreover, Nourish supports this argument with only two out-of-Circuit cases, both of which are contradicted by voluminous Seventh Circuit authority. *See*, note 10, *supra*.

**ii. Plaintiffs' CIPA and ECPA claims are well-pled.**

"CIPA is similar in nature to the ECPA" and "courts perform the same analysis." *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 U.S. Dist. LEXIS 66733, at *13 (N.D. Cal. Apr. 11, 2024). A claim exists under both the ECPA and the CIPA where a defendant intentionally uses or discloses the contents of

an intercepted electronic communication. 18 U.S.C. § 2511(1)(c)-(d); Cal. Penal Code § 631(a). Additionally, a claim also exists under the CIPA where a defendant "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any [violation of the CIPA]." Cal. Penal Code § 631(a).

### *1. Plaintiffs' allegations that their communications were intercepted in-transit establish claims for direct violation of the ECPA and CIPA.*

Nourish argues that Plaintiffs' CIPA and ECPA claims must fail because they fail to allege that their communications were intercepted in-transit, or that Nourish intentionally intercepted their communications. Both arguments are unavailing.

***First,*** Nourish falsely claims that Plaintiffs fail to allege an interception because they do not allege that their communications were communicated to Google contemporaneously. Mot. 17-18. In reality, Plaintiffs specifically and repeatedly allege precisely just that. For example, Plaintiffs allege that Google's Pixels "acquire information from the browser without notifying the user…***contemporaneously*** as the website user navigates the website"; that their Sensitive Health Information was "***requested and contemporaneously transmitted*** to Google"; that Defendant's "unknown duplication" of their Sensitive Health Information was "***simultaneous***"; and that the information collected by the Tracking Tools is "***transmitted in real-time*** as the user navigates a website." Compl. ¶¶ 32, 39, 48, 193 (emphasis added). This District has held that such allegations are sufficient to state a claim under both the CIPA and the ECPA. *See Aspen*, 2024 U.S. Dist. LEXIS 161090, at *19-20 (holding that almost identical allegations were sufficient to plausibly allege that Plaintiff's communications were intercepted in transit and denying motion to dismiss CIPA and ECPA claims); *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-cv-04493-FLA (MAAx), 2024 U.S. Dist. LEXIS 137781, at *21-22 (C.D. Cal. July 19, 2024) (same as to allegations that "Search Terms were replicated and sent in parallel to the tracking entities"). The cases cited by Nourish do not contradict this

conclusion. In fact, Plaintiffs use the exact terminology that the courts found missing in every case Nourish cites in opposition. *See Hernandez-Silva v. Instructure, Inc.*, No. 2:25-cv-02711-SB-MAA, 2025 U.S. Dist. LEXIS 153186, at *16 (C.D. Cal. Aug. 4, 2025) (plaintiffs failed to plead "real-time interception"); *Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 U.S. Dist. LEXIS 37355, at *25 (N.D. Ill. Mar. 3, 2025) (plaintiffs failed to plead that communications were "contemporaneously redirected"); *Peters v. Mundelein Consol. High Sch. Dist. No. 120*, No. 21 C 0336, 2022 U.S. Dist. LEXIS 23118, at *32 (N.D. Ill. Feb. 9, 2022) (same).

Nourish additionally argues that Google was "a direct recipient of the transmissions" and so "cannot be an interceptor." Mot. at 18. This argument misunderstands Plaintiffs' allegations and the subject technology. As Plaintiffs explain in their Complaint, communications between an Internet user's web browser and a website "consist of Requests and Responses." Compl. ¶ 36. "A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website." *Id.* ¶ 36. When Tracking Tools are installed on a website, the website administrator configures programmed "events" that define which user actions will trigger a transmission through the Tracking Tools. *Id.* ¶ 50. For example, Figure 3 in the Complaint shows the information transmitted by a "form_start" event that triggers when a user progresses through the appointment scheduling form on the Nourish Website. *Id.* ¶ 49. As a result of Nourish's choice to configure this "form_start" event, when a Website user clicks on the appropriate button to progress the form, they initiate two simultaneous communications, only one of which is visible to them: (1) the form information is transmitted to the Website, and (2) the "form_start" event is triggered, causing a copy of the form information to be sent to Google. *See generally, id.* ¶¶ 32, 39, 48, 193. There is no other way to characterize this software function other than as a wiretap: the same

occurrence that triggers the user's communication to be sent to the Website also triggers a simultaneous copy of that communication to be sent to Google. *See Aspen*, at *19 (allegations defendant "employed ... tracking technologies, to intercept, duplicate, and re-direct Plaintiffs' ... Private Information to third parties" sufficient to show interception in transit); *Loyola*, 2024 U.S. Dist. LEXIS 119995, at *13 (allegations that "tracking pixels operate by contemporaneously duplicating and redirecting their communications" sufficient to show interception in transit).

"At the motion to dismiss stage, a plaintiff is not required to allege how and when their communications are captured." *St. Aubin*, 2024 U.S. Dist. LEXIS 179067, at *15 (N.D. Cal. Oct. 1, 2024). Rather, a plaintiff must merely "'provide fair notice to [d]efendant of how and when she believe[s]' the defendant or the conspiring third party intercepts her communications.'" *Id.* Plaintiffs have surpassed this standard.

***2. Plaintiffs' allegations that Nourish aided Google in intercepting the contents of their communications also independently establish a violation of the CIPA.***

"[Cal. Penal Code ]§ 631(a) imposes liability on one who 'aids, agrees with, employs, or conspires' with another violator…. It is sufficient for a [p]laintiff to allege [a d]efendant[] intentionally procured Facebook Pixel or other tracking apps and installed it on [its] website in order to satisfy this requirement." *Danforth v. Placentia-Linda Hosp.*, 2023 Cal. Super. LEXIS 67193, *6 (Cal. Super. Ct. Aug. 31, 2023); *see also M.G. v. Therapymatch, Inc.*, 2024 U.S. Dist. LEXIS 166534, at *14-15 (N.D. Cal. Sep. 16, 2024) (allegations that defendant "knowingly agreed to use Google Analytics, embedded tracking technology code on its website, and allowed Google to have direct access to [defendant's website] users' private medical information" sufficient aiding and abetting under the CIPA). Thus, Plaintiffs also independently state a violation of CIPA based on Nourish's aiding and abetting of Google's interceptions.

### D. PLAINTIFFS' INVASION OF PRIVACY CLAIM IS WELL-PLED.

Plaintiffs have alleged an invasion of privacy claim based on the elements of publicity given to private life. Under Illinois law, a plaintiff alleging invasion of privacy through publicity given to private life must show that "(1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person." *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573, 579 (2000).[12]

***First***, Illinois courts follow the invasion of privacy standard set forth in the Restatement (Second) of Torts. *Reed v. MRS BPO, L.L.C.*, No. 1:21-CV-04066, 2022 U.S. Dist. LEXIS 156394, at *10 (N.D. Ill. Aug. 30, 2022). A plaintiff has properly alleged publicity where she shows that a matter is communicated "'to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* (quoting Rest. 2d of Torts, § 652D). Under this standard, even a "statement made in an address to a large audience, is sufficient to give publicity[.]" Rest. 2d of Torts, § 652D.

In the Complaint, Plaintiffs allege that their Sensitive Health Information was transmitted to a massive, global corporation, Google, not merely for its own use but for use in a mass advertising surveillance apparatus that includes the operators of ***74-percent*** of all web traffic. Compl. ¶¶ 5-12*, ¶ 23. Google makes no secret about the reason for this surveillance: all of the information they gather is used to sell targeted advertising to third parties. *Id.* In the words of Google's former CEO, these profiles allow advertisers to "know where you are[,] where you've been[,] and what you're thinking about." *Id.* ¶ 25. Courts have found such allegations properly plead a claim for invasion of privacy

[12] The California standard is the same. *See B.B. v. Grossman (In re Grossman)*, 538 B.R. 34, 43 (Bankr. E.D. Cal. 2015) ("Here, the invasion of privacy tort involves the public disclosure of private facts, for which the basic essential elements are: (1) public disclosure of (2) private (not public) facts (3) that would be highly offensive to a reasonable person and (4) of no legitimate public concern." (citing Restatement (Second) of Torts § 652D)

under similar or identical circumstances. *See, e.g., Brahm*, 2024 U.S. Dist. LEXIS 114827, at *20-21 (finding sufficient publicity where plaintiffs alleged that information disclosed through tracking pixel was transmitted to "various technology companies that employ hundreds of thousands of employees who have access to this information"); *In re Facebook, Inc.*, 402 F. Supp. 3d 767, 787 (N.D. Cal. 2019) (plaintiffs pled public disclosure of private facts because they alleged defendant made their internet data "widely available to third parties in a variety of ways; and as a result, third parties were able to develop detailed dossiers on the plaintiffs including information about their locations, their religious and political preferences, their video-watching habits, and other sensitive matters").

***Second***, the Sensitive Health Information at issue in this matter is undoubtedly private and not public, and the publication of this private information would be highly offensive to a reasonable person. *See Loyola*, 2024 U.S. Dist. LEXIS 119995, at *9 (holding that medical information is inherently private, and that the unauthorized dissemination of such information would no doubt be highly offensive to a reasonable person); *Roper v. Rise Interactive Media & Analytics, LLC*, No. 23 CV 1836, 2023 LX 72342, at *9 (N.D. Ill. Nov. 9, 2023) ("Plaintiffs allege that Defendant caused their sensitive health information, including medical diagnoses, to be improperly accessed and publicized to an unknown number of hackers, who can then sell that information. There is no doubt that a reasonable person would find the publication of this information to be highly offensive." (internal citation omitted)); *Thakkar v. Ocwen Loan Servicing, LLC*, 2019 U.S. Dist. LEXIS 83250, No. 15 CV 10109, at *13 (N.D. Ill. May 17, 2019) ("[F]acts regarding a person's financial or medical life *are* inherently private.") (emphasis in original)); *Acosta v. Scott Labor LLC*, 377 F. Supp. 2d 647, 650 (N.D. Ill. 2005) ("Examples of inherently 'private facts' include 'a person's financial, medical, or sexual life, or a peculiarly private fact of an intimate[,] personal nature.'" (quotation omitted)).

Therefore, Plaintiffs have properly alleged invasion of privacy through publication of private facts.

### E. PLAINTIFFS STATE A VALID CLAIM FOR BREACH OF IMPLIED CONTRACT

Under Illinois law, a contract can be implied from the facts, conduct of the parties, and circumstances that demonstrate the parties' intent to be bound. *Trapani Const. Co. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734 (Ill. App. Sept. 23, 2016). "To sustain a claim for breach of implied contract, a plaintiff must allege that (1) a contract existed, (2) the plaintiff performed his obligations under that contract, (3) defendant breached the contract, and (4) the plaintiff suffered damages as a result of that breach." *Nazarro v. Tecta Am. Corp.*, No. 25 C 448, 2025 U.S. Dist. LEXIS 175554, at *16 (N.D. Ill. Sept. 9, 2025). Plaintiffs' allegations satisfy these requirements.[13]

***First***, "[u]nder Illinois law, an implied-in-fact contract arises from a 'promissory expression which may be inferred between the facts and circumstances and the expressions [on] the part of the promisor which show an intention to be bound.'" *Doe v. Fertility Ctrs. of Ill.*, No. 21 C 579, 2022 U.S. Dist. LEXIS 59145, at *12 (N.D. Ill. Mar. 31, 2022) (quoting *Estate of Jesmer v. Rohlev*, 241 Ill. App. 3d 798 (Ill. App. 1993)). Courts applying Illinois law have found an implied contract where a plaintiff is required to disclose medical information to the defendant as a condition to doing business with it. *See, e.g., id.*; *Lozada v. Advocate Health & Hosps. Corp.*, 2018 IL App (1st) 180320-U, ¶ 27 (Ill. App. Dec. 24, 2018) (implied contract found where plaintiffs "alleged that '[i]n order to benefit from [defendant]'s services, [p]laintiffs were required to disclose' their sensitive information"); *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 60 (finding an implied contract existed where "plaintiffs were required to provide their PII [to their employer] while being employed"). Courts have similarly articulated when

[13] As an initial matter, Defendant contends Plaintiffs' breach of implied contract claim should be dismissed because an express contract, its Terms of Use, governs. Mot. at 23. This argument fails due to the same lack of notice discussed in Section IV(B)(i), *supra*, with regards to Nourish's Privacy Policy. But regardless, a plaintiff may bring alternative breach of express contract and breach of implied contract claims. *See Doe v. Fertility Ctrs. of Ill.*, No. 21 C 579, 2022 U.S. Dist. LEXIS 59145, at *8-13 (N.D. Ill. Mar. 31, 2022) (finding plaintiff sufficiently pled both breach of express contract and breach of implied contract claims).

evaluating a breach of implied contract claim in the data privacy context that "an implied contract is formed where a person discloses sensitive information in order to receive a benefit, with the expectation that such information will be protected." *Rudolph v. Hudson's Bay Co.*, No. 2019 U.S. Dist. LEXIS 7765, at *34 (S.D.N.Y. May 7, 2019); *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 531-32 (N.D. Ill. Nov. 23, 2011) (denying defendant's motion to dismiss by finding the existence of an implicit contractual relationship which obligated defendant to take reasonable measures to protect plaintiff's personal information). Here, Plaintiffs have plausibly alleged an implied contract requiring Nourish protect their Sensitive Health Information through reference to Nourish's HIPAA Notice of Privacy Practices, which makes a number of promises that information submitted to the Website will not be disclosed to third parties, as explained in Section IV(B)(ii). Plaintiffs also allege that they provided their Sensitive Health Information in exchange for medical services, and would not have entrusted Nourish with their Sensitive Health Information or paid for its services in the absence of an implied contract between them and Nourish obligating Nourish not to disclose their Sensitive Health Information without consent. Compl. ¶¶ 160-62, 165. Nourish breached its implied contracts with Plaintiffs by disclosing Plaintiffs' Sensitive Health Information to third parties without their consent.

***Second***, Plaintiffs plausibly allege an economic injury resulting from Nourish's breach of its implied contracts with them. Nourish relies on *Wittmeyer v. Heartland All. For Hum. Needs & Rts.*, No. 23 CV 1108, 2024 U.S. Dist. LEXIS 8803 (N.D. Ill. Jan. 17, 2024) to argue that Plaintiffs' "lost benefit-of-the-bargain allegations" does not identify actionable damages because "'Illinois has declined to hold that the alleged diminution of value of plaintiffs' personal information amounts to actual monetary damages.'" Mot. at 24 (quoting *Wittmeyer*, 2024 U.S. Dist. LEXIS 8803, at *17). But there is a critical difference between the instant case and *Wittmeyer*: In *Wittmeyer*, the defendant obtained the personally identifiable information at issue ***incidentally*** due to a business purpose unrelated to monetizing that information. This case is different. Plaintiffs allege that the Tracking Tools were installed to intercept

their valuable Sensitive Health Information because Nourish ***intended*** to exchange it for compensation. *Id.* ¶¶ 59-66. Indeed, Plaintiffs allege at length that Google values such information so highly that it provides access to its highly valuable marketing and analytics tools in exchange for it. *Id.* ¶ 26. Under these circumstances, the Court should find that Plaintiffs' allegations inherently state an economic injury because something has been taken from them and exchanged by Nourish for compensation.[14]

### F. PLAINTIFFS STATE A VALID CLAIM FOR BREACH OF FIDUCIARY DUTY

To state a claim for breach of fiduciary duty, a plaintiff must allege "that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 193 Ill. 2d 433, 444 (Ill. 2000). Illinois recognizes fiduciary duties in the physician-patient relationship, where patients rely on providers' expertise and entrust them with sensitive information. *Id.* Nourish, a medical provider offering appointments with registered dietitians, required Plaintiffs to disclose highly sensitive personal and medical information as a condition of care. Compl. ¶ 46. Plaintiffs allege a fiduciary relationship based on trust in Nourish's express promises of confidentiality and the confidential nature of the data shared. *Id.* ¶¶ 145-47.

Nourish argues there is no physician-patient relationship between Nourish and users of its Website. Mot. at 25-26. To be clear, "[a] physician-patient relationship is established where the

---

[14] Numerous courts have found the same. *See, e.g., In re Solara Med. Supplies, LLC Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1297 (S.D. Cal. 2020) ("The dissemination of one's personal information can satisfy the damages element of a breach of contract claim."); *Bray v. Gamestop Corp.*, No. 17-cv-1365, 2018 U.S. Dist. LEXIS 226220, at *4 (D. Del. Mar. 16, 2018) ("[P]laintiffs have plausibly alleged that data security was part of what they paid for but did not receive"); *Brahm*, 2024 U.S. Dist. LEXIS 114827, at *11-12 (denying motion to dismiss where plaintiff alleged that defendants' unauthorized disclosures "diminished the sales value of her PHI"). As the *Brahm* court noted, "further development of the record may show that plaintiff's damages theory are no more plausible than those rejected by the Seventh Circuit . . ., but in light of the more robust affirmative allegations of injury, the court [did] not dismiss plaintiff's breach of implied contract claim on this ground without room to develop the record." *Brahm*, 2024 U.S. Dist. LEXIS 114827, at *12.

physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient. The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient." *Fertility Ctrs. of Ill.*, 2022 U.S. Dist. LEXIS 59145, at *16 (N.D. Ill. Mar. 31, 2022) (citation omitted). By offering the Website to patients to schedule appointments with specific dietitians for specific goals, such as help losing weight, diabetes management, or treatment for eating disorders, Nourish participated in the care and treatment of its patients, including Plaintiffs. *See* Compl. ¶¶ 46-48 (demonstrating that for each patient who utilizes the Website, Nourish connects them with a specific dietitian in their state). This participation in specific patients' care or treatment suffices to establish a physician-patient relationship. *See Fertility Ctrs. of Ill.*, 2022 U.S. Dist. LEXIS 59145, at *17 (declining to hold on the pleadings that plaintiff did not have a physician-patient relationship with defendants where plaintiff had an initial consultation).

Despite knowing the sensitivity of this information and promising to protect it, Nourish intentionally breached its duty to its patients in order to profit off disclosures of their Sensitive Health Information. *Id.* ¶¶ 11, 60, 139. Because Plaintiffs plausibly allege (1) a fiduciary duty, (2) Nourish's breach of its duty to keep non-public medical information confidential, and (3) resulting harm, they state a valid claim for breach of fiduciary duty.

### G. <u>PLAINTIFFS STATE A VALID CLAIM FOR NEGLIGENCE</u>

#### i. Plaintiffs allege the existence of a duty that was breached by Nourish.

In 2017, the Illinois Legislature amended the Personal Information Protection Act ("PIPA") to require "data collectors in possession of the personal information of Illinois residents" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 Ill. Comp. Stat. Ann. 530/45. Since that amendment became effective, ***each and every*** court in this District that has considered this issue, including cases involving the same Tracking Tools at issue here, has found that "Illinois law

imposes a duty on data collectors to maintain reasonable security measures…. You collect it, you keep it safe." *Stein*, 2025 U.S. Dist. LEXIS 31273, at *22-23; *see also Aspen*, 2024 U.S. Dist. LEXIS 161090, at *25; *Loyola*, 2024 U.S. Dist. LEXIS 119995, at *19; *Mayer*, 2025 U.S. Dist. LEXIS 60486, at *16 (same). In short, "Plaintiffs have plausibly alleged that [Defendant] collected and then disseminated Plaintiffs' sensitive medical information[ ]without Plaintiffs' consent, which is enough for them to allege a negligence claim." *Mayer*, 2025 U.S. Dist. LEXIS 60486, at *16. "A health provider that has private medical information in its hands must handle with care." *Stein*, 2025 U.S. Dist. LEXIS 31273, at *23.

#### *ii. Plaintiffs' negligence claim is not foreclosed upon by the economic loss doctrine.*

Nourish falsely represents that Plaintiffs' implied contract claim forecloses upon their negligence claim through operation of the economic loss doctrine (more commonly known as the *Moorman* doctrine in Illinois). Mot. at 12. The "Illinois Supreme Court has held that the economic loss doctrine applies only where the duty of the party performing the service is defined by contract executed with the client." *Wittmeyer*, 2024 U.S. Dist. LEXIS 8803, at *7-8 (citing *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137 (Ill. 1994)). "To determine whether the *Moorman* doctrine bars tort claims, the key question is whether the defendant's duty arose by operation of contract or existed independent of the contract." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012). Here, Plaintiffs allege that Nourish violated the extracontractual duty of all data collectors "to maintain reasonable security measures." *Stein*, 2025 U.S. Dist. LEXIS 31273, at *22-23. The economic loss doctrine does not apply under such circumstances. *See Loyola*, 2024 U.S. Dist. LEXIS 119995, at *20 n.5.

### H. <u>PLAINTIFFS STATE A VALID CLAIM FOR UNJUST ENRICHMENT</u>

Plaintiffs assert their unjust enrichment claim in the alternative to their breach of implied contract claim. Compl. ¶ 168. Pleading them together "is entirely proper." *Cleary v. Philip Morris, Inc.*,

656 F.3d 511, 517 (7th Cir. 2011). Accordingly, Plaintiffs' unjust enrichment claim is properly pled for the same reasons as their implied contract claim. *See Fertility Ctrs. of Ill.*, 2022 U.S. Dist. LEXIS 59145, at *14 (N.D. Ill. Mar. 31, 2022) (where unjust enrichment is plead in the alternative, it rises and falls with alternative claim); *FDIC v. Campbell*, No. 11 CV 4061, 2012 U.S. Dist. LEXIS 9961, at *17 (N.D. Ill. Jan. 27, 2012) (noting a party may plead unjust enrichment in the alternative "when the existence of a valid contract is questioned.").

Nourish seeks dismissal of Plaintiffs' unjust enrichment claim "on the ground that unjust enrichment is not a separate cause of action under Illinois law. That is incorrect." *Mullen v. GLV, Inc.*, No. 18 C 1465, 2018 U.S. Dist. LEXIS 110302, at *11 (N.D. Ill. July 2, 2018). "Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust." *Cleary*, 656 F.3d at 517. "What makes retention of the benefit unjust is often due to some improper conduct by the defendant. And usually[,] this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute." *Id.* Plaintiffs allege that Defendant intentionally disclosed Plaintiffs' Sensitive Health Information for monetary benefit. Compl. ¶¶ 10*, 27, 59-66, 169. Plaintiffs' allegations suffice to adequately plead unjust enrichment at the motion to dismiss stage. *Allen v. Midwest Express Care, Inc.*, No. 24-cv-05348, 2025 U.S. Dist. LEXIS 151237, at *12 (N.D. Ill. Aug. 6, 2025) (denying motion to dismiss where plaintiffs alleged defendant was motivated by financial profit when it disclosed plaintiff's PHI and PII to unauthorized third parties).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion to Dismiss be DENIED.[15]

[15] Plaintiffs do not oppose Nourish's arguments pertaining to their claims for Breach of Confidence.

Dated: February 11, 2026

Respectfully submitted,

*<u>/s/ Sonjay C. Singh</u>*
Sonjay C. Singh (*pro hac vice*)
Mason A. Barney
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ssingh@sirillp.com
E: mbarney@sirillp.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Sonjay Singh, hereby certify that on February 11, 2026, I filed the attached with the Clerk of the Court using the Court's electronic filing system and will send such filing to all attorneys of record.

*<u>/s/ Sonjay C. Singh</u>*
Sonjay C. Singh